Hart, J.,
dissenting. The Brooklyn city ordinance provides that no person may maintain a trailer camp within the municipality without first securing a trailer camp license from the mayor for which the applicant must pay $25 for the license period of one year, without reference to the trailer capacity of the camp.
Section 7 of the ordinance provides:
“It shall be unlawful for any person to park or occupy a trailer in a trailer camp for more than sixty days, and no trailer camp licensee shall permit a trailer or occupants thereof to remain in a trailer Gamp for more than sixty days; nor shall a trailer licensee per *136 mit a trailer or the occupants thereof to re-enter the trailer camp for ninety days after the expiration date of a former occupancy; and it shall be unlawful for the occupants of a trailer to parle or occupy a trailer in any trailer camp for ninety days after the expiration date of a former occupancy in any other trailer camp within the village limits..” (Italics supplied.)
The questions here in issue are whether the city of Brooklyn has the power to enact and enforce the ordinance in question, and whether a municipal ordinance is a constitutional exercise of legislative power, which ordinance makes it unlawful for any person to park or occupy for more than 60 days a house trailer in a trailer camp located within the municipality until he has absented himself with his trailer from such trailer camp and all other trailer camps in such municipality. for a period of 90 days after the expiration of such 60-day period, and which makes it unlawful for a trailer camp licensee in such municipality to permit a trailer or its occupants to remain in his trailer camp for more than 60 days or to re-enter his camp for a period of 90 days after the expiration date of a former occupancy in his camp.
Under its general powers a municipal corporation may regulate by ordinance the use, control, repair and maintenance of buildings used for human occupancy or habitation, the number of occupants, and the mode and manner of occupancy; may compel the owners of such buildings to alter, reconstruct or modify them, or any room, store, compartment, or part thereof; and may prohibit the use and occupancy of such buildings until such rules, regulations and provisions have been complied with. See Section 3639, General Code (Section 715.29, Revised Code). Under its general powers, a municipal corporation may also provide for the collection and disposal of sewage, garbage, ashes, animal and vegetable refuse, dead animals and animal offal *137 (see Section 3649, General Code [Section 715.43, Revised Code]); and may abate any nuisance, regulate or prevent the emission of smoke, prevent injury and annoyance from any nuisance, regulate or prohibit the use of steam whistles, and regulate the installation and inspection of steam boilers and-steam boiler plants. See Section 3650, General Code (Section 715.44, Revised Code).
A municipal corporation, in addition to its general powers, is granted a number of specific powers, none of which, however, relate to the subject matter here to be considered. See Section 3939, General Code (Section 717.01, Revised Code). Although the Municipal Code grants power to a municipality to license certain activities and businesses, no general or specific power is granted to license or regulate house trailer parks, as such, within the corporate limits.
On the other hand, general sanitary and public health matters, including the regulation of trailer parks, are delegated' and entrusted to another branch of state government and through it to units of local government. Section 1234, General Code (Section 3701.33, Revised Code), provides for a state board known as the Public Health Council which consists of seven members appointed by the Governor for terms of seven years. The powers and duties of this “council” are to make and amend sanitary regulations of general application throughout the state, which body of regulations is known as the “sanitary code.” See Section 1235, General Code (Section 3701.34, Revised Code). Every regulation adopted by the Public Health Council shall state the date on which it takes effect, and copies thereof shall be filed in the office of the Secretary of State and sent by the director of health to each board of health within the state and shall be published in such manner as the state council may determine. By statute, every provision of the sanitary *138 code shall apply to and be effective in all portions of the state. See Section 1236, General Code (Section 3701.35, Revised Code).
By statute, the state is divided into health districts. Each city constitutes a health district known as a city health district. Townships and villages of each county are combined into a health district known as a general health district. See Section 1261-16, General Code (Section 3709.01, Revised Code). The board of health of a city health district, appointed by the mayor of the city to act on behalf of the city government, may make such regulations as are necessary for the public health, prevention of disease and the prevention, abatement or suppression of nuisances. All orders and regulations of the board of health, not for its government but intended for the general public, shall be adopted, recorded, published and certified as ordinances of the •municipal corporation. See Section 1261-42, General Code (Section 3709.21, Revised Code). The board of health of a city or city health district shall abate and remove all nuisances within its jurisdiction. It may, by order, compel owners or occupants of any lots or property to abate and remove any nuisance thereon. When premises, business pursuit, matter or thing is, in the opinion of the board, a condition dangerous to life or health, it may declare it a public nuisance and order it to be removed, abated, suspended, altered or otherwise improved. See Sections 4420 and 4421, General Code (Section 3707.01, Revised Code).
On May 3, 1951, the General Assembly took cognizance of the matter of house trailer parks by legislative enactment, effective August 8, 1951, which provides that the state Public Health Council, herein referred to and described, may make regulations of general application throughout the state governing the location, layout, construction, drainage, sanitation, *139 safety and operation of house trailer parks. See Section 1235-1, General Code (Section 3733.02, Revised Code). The General Assembly provided further for a system of house trailer park licenses. On or after the first of December, but before the first of January of the next year, every person who intends to operate a house trailer park shall procure a license to operate such park for such year, not from the mayor of the city but from the board of health of the district in which the park is located—in this case the board of health of the city of Brooklyn. See Section 1235-2, General Code (Section 3733.03, Revised Code).
The board of health of the district in which a house trailer park is located, representing the governmental .authority of its district, may charge an annual fee for the right to operate such park. Such fee includes the cost of licensing and all inspection and is fixed as follows: For parks having a capacity of less than 25 house trailers, not more than $15; for parks having a capacity of 25 or more trailers but less than 100, not more than $25; and for parks having a capacity of 100 or more trailers, not more than $35. See Section 1235-3, General Code (Section 3733.04, Revised Code). And the board of health of the district may refuse to grant, may suspend “ or may revoke any license for failure to comply with regulations adopted by the Public Health Council. See Section 1235-5, General Code (Section 3733.05, Revised Code).
The license fees for house trailer parks received by a city board of health inure to the benefit of the city. They, together with fines imposed for the violation of the provisions of the health code, are paid to the city treasurer and are credited to the health fund. When expenses are incurred by a city board of health they are certified to the city and it becomes the duty of the legislative body of the city to pass the necessary ap *140 propriation to pay such expenses. See Sections 4451 and 4418, General Code (Sections 3707.28 and 3707.53, Revised Code).
With this legislative governmental setup, it is inconceivable that two licenses may be issued to and two license fees exacted from the owner or operator of a house trailer park by two different branches of the same unit of local government—the board of health and the city council or mayor—for the operation of the house -trailer park within its territorial limits, especially since the General Assembly by legislative enactment placed a limit upon the license fees for the operation of house trailer parks.
It is also to be noted that under this act providing for the regulation of house trailer parks, there is no limitation upon the stay of a house trailer in a trailer park. Indeed the inference is that it may remain as long as it is agreeable with the operator of the park and as long as the owner of the trailer complies with all the sanitary and health regulations.
On December 2, 1951, the Public Health Council of this state, pursuant to the statute above referred to, adopted regulations for house trailer parks, which are known as regulations 260 to 290, inclusive, all of which became effective Decembe’r 17, 1951. These regulations, which are equivalent to state statutes, cover the subject of licenses to operate house trailer parks in accordance with the terms of the statute, approval of plans and layouts for such parks, water supply, plumbing facilities, and sewage,.garbage and other refuse disposal, fire protection and supervision. In this elaborate code of regulations, relating to the location, occupancy and operation of house trailer parks, there is no provision limiting the time of occupancy by any trailer in a trailer park.
In my opinion, the General Assembly, by the adoption of the legislation above referred to, has granted *141 to the Public Health Council and the district boards of health of the state exclusive power and jurisdiction to license house trailer parks and to regulate the same through sanitary and health measures adopted by their authority, and the councils of cities have no such power or jurisdiction.
In the case of Richards v. City of Pontiac (1943), 305 Mich., 666, 9 N. W. (2d), 885, the Supreme Court of Michigan held invalid an ordinance limiting the parking of occupied trailers in a trailer camp to a period not to exceed three months in any twelve months. The court held further that the state by the enactment of appropriate legislation permitted unlimited parking of trailers; that the state law also provided for license fees and their allocation to various governmental units; that the ordinance in fixing a time limit for the parking of trailers conflicted with the state regulations and was void; and that, the state having entered the field of licensing trailer camps, any provision for additional fees, imposed by an ordinance for such licensing, was also void.
Furthermore, the ordinance in the instant case is, in my opinion, void because it is, in several vital respects, in conflict with state legislation. The mayor of Brooklyn has no power to grant a house trailer park license or collect the license fee because the city is the beneficiary of the fee for a license granted under a state law through the city board of health. The license fee of $25 per year under the ordinance, without regard to the trailer capacity of the park, is in conflict with that prescribed by state law, in that section 4A of the Brooklyn ordinance requires only 875 square feet to each lot in the trailer park, whereas regulation No. 267 of the state Public Health Council requires 1,250 square feet of land for each trailer lot. The penalty for the violation of the provisions of the Brooklyn house trailer park ordinance, to wit, not less than $25 nor *142 more than $49 for each offense, is in conflict with the penalty provided for such violations under the state law, to wit, not more than $100 or imprisonment for not more than 90 days, or .both. See Section 1235-4, General Code (Section 3733.99, Revised Code). In fact, the Brooklyn ordinance can not be enforced by penalty in a single instance, without coming in conflict with the state statute as to penalty—the penalty for violation under the ordinance being not less than $25, whereas under the state law it may be any lesser sum up to $100.
It is fundamental law that if a municipal ordinance has no reasonable relation to the morals, health and safety of the people of the municipality, it is invalid as an unauthorized exercise of the police power. 37 American Jurisprudence, 927, Section 288, citing City of Youngstown v. Kahn Bros. Bldg. Co., 112 Ohio St., 654, 148 N. E., 842, 43 A. L. R., 662; and McConnell v. City of Knoxville, 172 Tenn., 190, 110 S. W. (2d), 478, 113 A. L. R., 966.
This court, as well as other courts, has held that, although a state or municipality may make all reasonable, necessary and appropriate provisions to promote the health, morals,, peace and welfare of the community, such provisions must not be unreasonable; and that the means adopted must be suitable to the end in view, must be impartial in operation and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond the necessities of the situation. Froelich v. City of Cleveland, 99 Ohio St., 376, 124 N. E., 212; 8 Ohio Jurisprudence, 358, 359, Section 250; Wondrak v. Kelley, 129 Ohio St., 268, 195 N. E., 65; Nebbia v. New York, 291 U. S., 502, 78 L. Ed., 940, 54 S. Ct., 505.
In the case of Town of Southport v. Ross, 109 N. Y. Supp. (2d), 196, the court held that the provisions of *143 an ordinance of Southport prohibiting the location of a house trailer on private property for more than four weeks did not have any reasonable relation to the common good of the community, where the trailer had facilities equal or superior to those required of house trailers located in trailer camps in the community ; and that the ordinance provision did not have any reasonable relation to the health, safety, or welfare of the community, and was invalid. To the same effect, see Richards v. Pontiac, supra.
In the instant case, the ordinance requires each occupant of a trailer, under severe penalty, to move from his rented lot or park space and out of the park after 60 days of occupancy. Thereafter, he is not permitted to park in this or any other trailer park in the city of Brooklyn until after a period of 90 days. He is not even permitted, during this 90-day period, to go back to the park as a resident in a trailer which has a right of occupancy, without being subject to arrest under this ordinance. In the meantime, any other trailer and its occupants, regardless of how much less desirable they may be, may move into the same space or parking lot for 60 days, and still another may do the same for a period of 30 days, after which the original trailer and the same occupants who have been exiled from the city for 90 days may return to the very same location and remain in the park under the same conditions as upon the former occupancy for another period of 60 days when they must again move out. In other words, the same space or lot may be occupied by a trailer continuously, but the occupancy must be by a different trailer and different occupants every 60' days. These facts, in my opinion, make it clearly apparent that the purpose of the ordinance has no relation to the health and welfare of the.community..