Allen, J.
 

 The plaintiff in error contends that the building contemplated by the defendants in error violates the so-called zoning ordinance of the city of Youngstown, and that the Court of Appeals therefore erred in making the injunction perpetual.
 

 The defendant in error contends that the ordinance is unconstitutional, in that it contravenes provisions of both the federal and state Constitutions, namely, the Fourteenth Amendment of the Constitution of the United States, which provides, “Nor shall any state deprive any person of life, liberty or property, without due process of law,” and Article I, Section 19, of the Constitution of Ohio, which provides, “Private property shall ever be held inviolate, but subservient to the public welfare. * * * where private property shall be taken for public use, a compensation therefor shall first be made in money * *
 

 It is conceded that the state under the police power has the right to limit the use of private property for the purpose of preserving the public .health, safety and morals, and that the state can delegate its police power to a municipality; that where, by virtue of such a delegation, or by virtue of specific constitutional authority, the municipality
 
 *658
 
 exercises such power, it is to be presumed that such power has been legitimately exercised; and that where such power has been legitimately exercised there is no taking of private property without compensation merely because some legitimate use of the property has been restricted.
 

 It is conceded, also, that the police power is not unlimited and must not be arbitrarily exercised, that the police power cannot be invoked for purely aesthetic considerations, nor to promote merely private comfort or private welfare, and that while a statute or ordinance is presumed to be valid a mere declaration therein that it is enacted to protect public safety, health or morals will not render the statute valid as being within the police power unless there is some reasonable relation between such purpose and the regulation prescribed.
 

 There is no difficulty in stating these principles. The difficulty arises in fitting these conceded principles to the facts before us.
 

 The building contemplated, contravenes that provision of the ordinance which requires that none but single or two-family houses be built within this district, as it will contain 30 apartments. The main legal question arising in this case is whether a specific use restriction, which prohibits apartment houses from being built within a purely residence section, is constitutional.
 

 'Sections 4366-1 to 4366-5, General 'Code (106 O. L. 455), and Sections 4366-7 to 4366-12 (108 O. L., pt. 2, 1175), supplemental thereto, embody the act “providing for a city planning commission in municipalities,” and provide that such city
 
 *659
 
 planning commission in any municipality may make plans for zoning the municipality into districts and for regulating the structure and location of buildings and the use of buildings and land within such districts.
 

 Section 4366-8 provides that after the city planning commission has certified to the council a plan for the zoning of a municipality, then the council in the interest of the promotion of the public health, safety, convenience, comfort, prosperity, or the general welfare, may regulate the location of buildings and other structures, and of premises to be used for trade, industry, residence, or other specific uses, and for said purpose may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purpose of this section. For each of such districts, regulations may be imposed designating the kinds or classes of trades, industries, residences, or other purposes, for which buildings or other structures or premises may be permitted to be erected, altered, or used, subject to special regulations.
 

 If the ordinance in question is valid as an exercise of the police power, it is authorized under the statute, and under the home-rule provision of the .Ohio Constitution, Article XVIII, Section 3, as it deals with a function of local self-government. Hence the question before us is whether an ordinance of the kind set forth by this particular record, covering the particular sort of district established, which prohibits the erection of more than a two-family dwelling in this particular residence dis
 
 *660
 
 triet, is a legitimate exercise of the police power. The decision of this question necessarily involves an application of the law to the particular facts in the case, which upon this point are conceded. It will he observed that in distinction to the case of
 
 Pritz
 
 v.
 
 Messer, ante,
 
 628, 149 N. E., 30, this day decided, which construed a comprehensive ordinance that had been thought out, in most careful detail, dealing with every section of the city of Cincinnati, the ordinance in this case covers merely a small fraction of the entire city of Youngstown. Moreover, the instant case differs from the
 
 Pritz case
 
 in the fact that the Cincinnati case, upon the record, did not raise the specific question as to whether property can legally be zoned in residence districts so as to exclude apartment houses which in other respects comply with valid building restrictions.
 

 In other words, this is not a comprehensive zoning ordinance-, but is a so-called “block” ordinance, relating only to a certain small district of the city of Youngstown. Also the record shows in clear terms that so far as the health and safety of the inhabitants of this apartment house are concerned, there is in the city of Youngstown no more healthful and better spot in which to reside than in this particular district. This is the testimony of the eminent physician who was chairman of the city planning commission. Moreover, there is nothing in the record to indicate that the health, safety, or morals of the district, or of the city of Youngstown, will be impaired by the building of this apartment house, unless it be conceded that an apartment
 
 *661
 
 house is a nuisance
 
 per se.
 
 Hence the case is strongly distinguished upon the facts from the
 
 Pritz case,
 
 and, indeed, from all the cases cited, to us.
 

 A positive prohibition is imposed by the ordinance upon the erection of an apartment house upon residence territory within the district. Thus the owner is substantially deprived of the use of his property. If this deprivation is reasonably imposed to prevent the use of the property for any purpose directly detrimental to the public health, morals, or safety, such a restriction does not legally constitute a taking of property without compensation and without due process. This is true, for the reason that all property is held subject to the police power of the state, and the state has the inherent right to prevent a citizen from using his property in a way which is harmful to the public health, safety, or morals. 6 Ruling' Case Law, 201.
 

 The police power, however, is based upon public necessity. There must be an essential public need for the exercise of the power in order to justify its use. This is the reason why mere aesthetic considerations cannot justify the use of the police power.
 
 Haller Sign Works
 
 v.
 
 Physical Culture Training School,
 
 249 Ill., 436,
 
 94
 
 N. E., 920, 34 L. R. A. (N. S.), 998, and note. It is commendable and desirable, but not essential to the public need, that our aesthetic desires be gratified. Moreover, authorities in general agree as to the essentials of a public health program, while the public view as to what is necessary for aesthetic progress greatly varies. Certain Legislatures might consider
 
 *662
 
 that it was more important to cultivate a taste for jazz than for Beethoven, for posters than for Bernbrandt, and for limericks than for Keats. Successive city councils might never agree as to what the public needs from an aesthetic standpoint, and this fact makes the aesthetic standard impractical as a standard for use restriction upon property. The world would be at continual seesaw if aesthetic considerations were permitted to govern the use of the police power. We are therefore remitted to the proposition that the police power is based upon public necessity, and that the public health, morals, or safety, and not merely aesthetic interest, must be in danger in order to justify its use.
 

 Does the apartment house
 
 per se
 
 endanger the public health, morals, or safety? It is true that noise affects health through nerve strain, and the apartment house is attacked upon the ground of noise; but people who live in apartment houses may not of themselves be so noisy as people who live in private houses. The very fact that they have learned to consider the foibles of others living within the same walls often makes them more thoughtful with regard to phonographs and pianos than the people who dwell in private houses. Two-family houses might house families which would make five times as much noise as the people in large apartment houses. There is not
 
 per se
 
 more danger from fire from an apartment house than from a private house, for modem apartments are apt to be fireproof, as is contemplated in this instance. Perhaps there is even less danger of fire from an apartment house than from a private house of frame and shingle roof. It is argued that an
 
 *663
 
 apartment house menaces the public health because it increases congestion of population. We fail to see how removing the congestion from an apartment district, and distributing it in a healthful park surrounding, will injure the health of the city at large; rather will it aid the public health.
 

 It is also urged that this apartment house will result in congestion of traffic and danger to automobiles. The answer to that contention is that removing part of the congestion of traffic from more crowded areas to districts where there is more space, where there are fewer children playing upon the streets, cannot be said to interfere with the public safety.
 

 Neither are the people who live in apartment houses less moral
 
 per se
 
 than those who live in single dwellings. Since an apartment house does not of itself constitute a nuisance, we fail to see how its exclusion from a residence district of the specific kind here created falls within the police power. In other words, the ordinance has no reasonable relation to the public health, morals, or safety.
 

 This is a case of a use restriction pure and simple. Numerous cases have arisen involving use restrictions, for the most part construing ordinances prohibiting the building of business plants or structures within residence districts. In these cases the use restrictions have frequently been held invalid.
 

 We see less reason for excluding an apartment house from a strictly residence district than for excluding a store or other business of a non-nuisance character from a strictly residence dis
 
 *664
 
 trict. Ordinances prohibiting’ the establishment of a nonnuisance business within a residence district have frequently been held unconstitutional, upon the ground that they constitute a taking of private property without compensation.
 
 City of St. Louis
 
 v.
 
 Evraiff,
 
 301 Mo., 231, 256 S. W., 489;
 
 Ignaciunas
 
 v.
 
 Risley, Bldg. Inspector,
 
 98 N. J. Law, 712, 125 A., 783;
 
 State ex rel. Westminster Presbyterian Church
 
 v.
 
 Edgecomb,
 
 108 Neb., 859, 189 N. W., 617, 27 A. L. R, 437.
 

 Moreover, these cases arose under proper zoning ordinances, so called, which carefully districted the territory of the entire city, and were stronger upon the facts in favor of the validity of the ordinance than the instant case.
 

 If a nonnuisance business cannot be excluded from a residence district, how can an apartment house, which is built for the specific purpose of providing residences, be excluded from a residence district, particularly when the residence district is practically the only district in the city where an apartment house could be built without restricting light and air space and without further congesting traffic and population?
 

 An argument in favor of the validity of the use restriction of this kind does exist. It is that some advantage will result to the public health, safety, and morals from having certain districts kent entirely free from the intrusion of apartment houses, in order that the community in the future may develop large residence districts in which it is reasonably possible and certain that large numbers of small and reasonably priced one and
 
 *665
 
 two-family houses will be built. The argument is that if such districts are made accessible to the owners of small homes, and apartment houses are excluded from such districts, the resident families will not incur the danger of having the district-blighted by the entrance of tenement construction. It is possible to see a relation between such a plan and the public health, morals, and safety. It is possible to conceive that such a building development carried out over a long period of years will affect the public health and contribute to the publio morals because of the encouragement which it will give to normal home life; because it will tend to eliminate the slum, and, incidentally, will enhance the public safety, rooted as that safety is in proper home conditions and proper public health. There is no such condition in this case. Here a small district bordering upon a park, which itself will never be sold for homes, is cut out of the heart of Youngstown in a line so irregular as to justify the conclusion that the enactment was hastily passed for the purpose, as a witness states, of merely eliminating a proposed filling station. The uncontroverted testimony shows that the building of an apartment house in this district will not harm the health, morals, or safety of the residents of the apartment house, nor of the district, nor of the city of Youngstown. The area of the district is not sufficient ever to make it possible to give to the man of small means the opportunity of building a home within this district from which apartment houses are excluded, nor are other similarly restricted districts provided in the city. The
 
 *666
 
 discrimination which is thereby made between, the district of the wealthy and the district of the poor can not under this ordinance be overcome.
 

 This case is upon all fours with the case of
 
 Ingersoll
 
 v.
 
 Village of South Orange, (N.
 
 J.), 126 A., 213, which held a similar ordinance invalid. In fact, this case involves a discrimination more unrelated to the public welfare than the
 
 Ingersoll case
 
 or any other case cited to us.
 

 In our opinion, therefore, this particular ordinance, in so far as it undertakes to limit the use of land in this district to residences which can house one or two families only, has no relation to the public health, safety, morals, and welfare, and falls outside of the inherent police power of the municipality ; and the ordinance is void and of no effect.
 

 The ordinance provides that within the district no building shall be erected to a height in excess of 2% stories, or in excess of 35 feet, except churches, schools, or library buildings, which may be erected to 4 stories or 50 feet in height.
 

 The apartment house planned will come within the height limitation of 35 feet, but is contemplated to be 3 stories high, instead of '2% stories, as required by the ordinance.
 

 Since the limitation of the number of stories in buildings could be justified under the police power upon the sole ground that it has reasonable relation to the number of families to be housed in the building, and since we have held that under the facts in this particular case a restriction of this kind upon the number of families in a building to be built -within this particular residence district is invalid, necessarily the restriction that houses
 
 *667
 
 of 2% stories only can Tbe constructed within the district is also invalid.
 

 This holding makes it unnecessary to consider the question as to the validity of the permit. Judg’ment of the Court of Appeals affirmed.
 

 Judgment affirmed.
 

 Marshall, C. J., Jones and Matthias, JJ., concur.
 

 Robinson, J., concurs in the judgment.