**EAST FAIRFIELD COAL COMPANY et, Plaintiffs, v. MILLER, ZONING INSPECTOR, et, Defendants.**

Common Pleas Court, Mahoning County.

No. 140481. Decided November 10, 1955.

Zieger & Coope, Youngstown, Harrington, Huxley & Smith, Youngstown, and McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, for plaintiffs.

Manchester, Bennett, Powers & Ullman, Youngstown, for defendants.

\*        \*        \*        \*        \*

494

496

## OPINION

By MAIDEN, J.

I. Taking up the claims of the plaintiffs in the order above set forth, the first is that the enabling legislation (§519.01 et seq R. C.), containing exemptions for agriculture and other uses of land, the effect of which denies to other users of land the uniform protection òf the laws and violates the constitutional provisions above mentioned, is therefore unconstitutional and invalid. **Sec. 519.20 R. C.** classifies outdoor advertising as a business use and provides that it shall be permitted in all districts zoned for industry, business or trade, or lands used for agricultural purposes. **Sec. 519.21 R. C.** provides that nothing in the Act shall confer any power on any board of township trustees or board of zoning appeals to prohibit the use of any land for agricultural purposes, and defines the meaning of the word, "agriculture." **Sec. 519.21 R. C.** provides that nothing in the Act shall confer any power on the township trustees or board of zoning appeals in respect to buildings or structures of any public utility or railroad or the use of land by any public utility or railroad for the operation of its business; it further provides that no power is conferred on any board of county commissioners, township trustees or board of zoning appeals to prohibit the use of any land or building for the maintenance and operation of any mercantile. or retail establishment, drug store, hotel, lunch room, restaurant or place of entertainment in any area zoned for trade or industry.

Plaintiffs state on Page 7 of their trial brief as follows:

"The effect of the foregoing sections of the enabling act would preclude township trustees from regulating the construction or maintenance of hog pens, chicken yards and stables within a residential district of the township but would permit them, as in the Canfield Township Zoning Ordinance, to prohibit the owner of the land on which such improvements are located from removing mineral resources worth $4,000 per acre, exclusive of their value to the community."

It is the claim of the plaintiffs that this type of exemption for agriculture and other purposes has been held unconstitutional by the Supreme Court of the United States in the case of Connolly v. Union Sewer Pipe Company, 184 U. S. 540 (1902), wherein the Court was considering an anti-trust statute of the State of Illinois which contained the following language:

"The provisions of this act shall not apply to agricultural production or live stock while in the hands of the producer or raiser." The Court held the foregoing exemption was unconstitutional and void because it denied to those pursuing activities other than agriculture the equal protection of the laws, and that since the exemption was invalid and the producers of agricultural products would thereby be subjected to the anti-trust law of Illinois, contrary to the intention of the legislature, the entire anti-trust law was unconstitutional.

Plaintiffs further cite Smith v. Cahoon, 283 U. S. 553 (1930), wherein the Court considered a Florida statute requiring motor vehicle carriers to obtain certificates of necessity and convenience, which statute exempted from such requirements transportation companies engaged exclusively in transporting agricultural, horticultural, dairy or other farm products. As stated, the Court held there was no justification for the distinction exempting carriers of agricultural products from the requirements of the act and held it was discriminatory and unconstitutional.

Other cases cited by plaintiffs are: Winter v. Barrett, 352 Ill. 441; 186 N. E. 113 (1933); Kellyville Coal Co. v. Hanier, 207 Ill. 624; 69 N. E. 927 (1904); Columbus Metropolitan Housing Authority v. Thatcher, 140 Oh St 38; 42 N. E. (2d) 437 (1942).

It would seem that those cases are entirely distinguishable from the matter at bar. In the Connolly case we have a penal statute enacted for a certain distinct purpose which exempted for no sound or logical reason whatever certain individuals and corporations from its operation; similarly, in the Smith case, as well as in the other cases cited. In those cases the classification is not based on anything having relation to the purpose for which it is made. Here we have no penal or regulatory statute legislating against a course of conduct or action which arbitrarily exempts anyone from that prohibited conduct or action. Here we have a grant of authority by the Sovereign to one of its branches, namely, the township trustees, and in conneciton with that grant of authority, the Sovereign puts certain limitations upon the local power to act. Here the classification is based on sound and logical factors having relation to the purpose for making it, as well as a definite relation to the Act itself. There is no doubt that the legislature has power to make a classification provided the basis of classification is not an arbitrary one; a statute is general and uniform within the requirements

of the Constitution if it operates equally upon every person and locality within the circumstances covered by the Act, and when a classification has a reasonable basis, it is not invalid merely because not made with exactness or because in practice it may result in some inequality. It is said the clasification must not be arbitrary, artificial, ficticious or evasive, used to circumvent the constitutional requirement of uniformity but must be based upon a real and substantial distinction in the nature of the class or classes upon which the law operates. 8 O. Jur. Page 630; 58 Am. Jur., Zoning, Paragraph 75, Page 989.

"The permissible location within a municipality of particular public utilities is sometimes designated by ordinance and the validity of such an ordinance has been upheld as a proper exercise of the police power, but public utilities are also often expressly excepted from the prohibitions or restrictions of zoning laws. * * * Such provisions are not invalid as * * * class legislation or a denial of the equal protection of the laws, since there is sufficient reason for the distinction based upon the comfort and convenience of the public." 58 Am. Jur., Zoning, Paragraph 122, Pages 1009-1010.

"Zoning ordinances sometimes exempt farming, truck gardening or horticultural or agricultural activities generally from inclusion among businesses prohibited in specified zones. Such exception does not render the ordinance void." 58 Am. Jur., Zoning, Paragraph 75, Page 989 (cited above).

The same principle would apply where the constitutionality of a statute is challenged. The nature of the business in which railroads and public utilities are engaged and its relation to the public welfare clearly justify the legislature's action; the same thing is true as to agriculture in connection with township and county zoning. As to outdoor advertising, sound reason can readily be seen for the exemption, without going into detail.

The Court holds that the township zoning enabling act and the Canfield Zoning Ordinance are not upon the basis of this claim unconstitutional.

II. Plaintiffs' next claim is that the regulation of strip-mining is a matter of state-wide concern over which township trustees have no power and, therefore, the zoning ordinance is invaild. They point out that Article II, Section 1, of the Ohio Constitution provides that the legislative power of a state shall be vested in a General Assembly, and that Article II, Section 36, reads in part as follows:

"Laws may be passed to encourage forestry * * * to provide for the conservation of the natural resources of the state, * * * and to provide for the regulation of methods of mining, weighing, measuring and marketing coal, oil, gas and all other minerals."

It should be noted that this quoted language invests the legislature with power for the regulation of methods of mining, etc., rather than providing for regulations where coal might or might not be mined. It is not material to discuss whether or not the Legislature would have power to control by statute where coal may be mined; it has not done so. The power to pass laws providing for the enactment of county and township zoning laws flows rather from Article II, Section 1, vesting

the legislative power of the State in the General Assembly; that necessarily includes the police power. Article II, Section 36, is not to be construed as a limitation on Article II, Section 1; the language is not susceptible of that construction. It has been held that the legislative power "includes all legislative power which the object and purposes of the state government may require   Hence the difference between the Constitution of the United States and our State Constitution. In the former we look to see if the power is expressly given; in the latter to see if it is denied or limited." Baker v. Cincinnati, 11 Oh St 534; Williams v. Scudder, 102 Oh St 305, 131 N. E. 481.

Hence, the Legislature in §519.02 et seq R. C. invested the township trustees with the power to regulate location, size and use of buildings and lands, the pertinent part of which section is as follows:

"* * * regulate * * * the uses of land for trade, industry, residence, recreation, or other purposes in the unincorporated territory of * * * (the township, and for such purposes * * * the power to * * * divide all or any part of the unincorporated territory of the township into districts or zones of such number, shape and area as the board determines * * *. All such regulations shall be uniform for each class or kind of * * * use throughout any district or zone, but the regulation in one district or zone may differ from those in other districts or zones."

Plaintiffs assert that the State, by the enactment of the statutes dealing with mining, §4151.02 et seq R. C., has pre-empted the field, "and where the General Assembly has occupied the field to regulate that subject matter, any ordinance seeking to regulate the same matter, let alone prohibit it where it is an otherwise lawful activity, is invalid as being in conflict with general law." Many cases are cited and discussed in plaintiffs' brief dealing with the home rule provision of the Constitution as applied to municipalities. There is no doubt that a city under the home rule provision cannot enact regulations which conflict with the general law or which encroach upon areas where the matter is of state-wide concern and the state has acted. The answer in the case at bar is that the legislature has authorized the townships in their zoning ordinances to regulate the use of land in the terms above quoted, and the courts have upheld that power so long as the regulations are reasonable and not arbitrary and not prohibitory. As stated in defendants' brief, "How strip mining shall be carried on is one thing. Where it may be carried on is quite another." Also: "By not including strip-mining among those businesses which it specifically exempted from the operation of township ordinances, it clearly intended that strip-mining should be subject to such ordinances." Smith v. Juillerat, 116 Oh St 424, 119 N. E. (2d) 611 (1954), wherein the Court said:

"The purpose of a zoning ordinance is to limit the use of land in the interest of the public welfare. If a zoning ordinance is general in its application, the classification as to uses to which the property may be devoted are reasonable, and pre-existing vested rights are recognized and protected, it is a valid exercise of the police power. Village of Euclid v. Amber Realty Co., 272 U. S. 365, 71 L. Ed., 303, 47 S. Ct., 114, 54 A. L. R. 1016; Pritz v. Messer, 112 Oh St 628, 149 N. E. 30; Koch v. City of Toledo, 37 F. (2d) 336.

"The ordinance in question is similar to other zoning ordinances relating to the strip mining of coal in residential areas, the validity of which have generally been recognized."

In Marshall Mining Company v. Village of Salineville, Seventh District Court of Appeals, Case No. 665, unreported, decided by the Third District Appellate Court sitting by assignment in the Seventh District, the Court held that the strip mining act recognized strip mining as a potential nuisance, and that the act did not purport to license strip mining or change the character of the potential nuisance, but only to regulate it, and that the ordinance did not conflict with the state strip mining act.

It should be stated at this point that there are some provisions of the Canfield ordinance which are invalid under the preemption doctrine; this will be discussed later.

It is the holding of the Court that the township trustees in accordance with the enacted zoning ordinance do have the power to legislate, regulate and prohibit the removal of the natural mineral resources contained in the township, but the application of this principle to any specific parcel of land is subject to constitutional limitations and safeguards, as will be analyzed hereinafter.

III. The next claim is that inasmuch as the statute requires the township trustees to promulgate any zoning ordinance in accordance with a comprehensive plan, the township trustees had no such plan and there was no such plan on a county or state level to supply the deficiency; hence the ordinance is invalid because not adopted in accordance with mandatory statutory requirements.

Inasmuch as §519.02 R. C. omits the words, "all in accordance with a comprehensive plan," §1.24 R. C. providing that is was the intent of the General Assembly not to change the law as heretofore expressed by the section or sections of the General Code in effect on the date of the enactment of the Revised Code, the Court is required to construe §3180 GC as it was in effect at that time.

Sec. 3180.26 GC, effective September 25, 1947, reads, in part, as follows:

"Sec. 3180.26 GC. (Effective September 25, 1947.) For the purpose of promoting public health, safety, morals, comfort or general welfare, to conserve and protect property and property values, to secure the most appropriate use of land, or to facilate adequate but economical provision of public improvements, all in accordance with a comprehensive plan, the Board of Trustees of any Township is hereby empowered to regulate by resolution the location, height, bulk, number of stories, size of buildings, and other structures * * *."

Sec. 3180.29 GC reads, in part, as follows:

"Sec. 3180.29 GC. It shall be the duty of the township zoning commission to submit a plan, including both text and maps representing the recommendations of the zoning commission for the carrying out by the Board of Township Trustees of the powers, purposes and provisions set forth in this act.

"The township zoning commission may within the limits of the monies appropriated by the township trustees for the purpose, employ or contract with such planning consultants and executive and clerical

assistants as it deems necessary. The commission shall organize, adopt rules for the transaction of its business and keep a record of its action and determinations. Members of the zoning commission shall serve without compensation. No township trustee shall be employed by the zoning commission of his township.

"The township zoning commission is directed to make use of such information and counsel as may be available from appropriate public officials, departments and agencies; and such public officials, departments and agencies having information, maps and data pertinent to township zoning are hereby directed to make the same available for the use of the township zoning commission.

"In any county where there is a county or regional planning commission, the township zoning commission may request said planning commission to prepare or make available to said township zoning commission a zoning plan including text and maps of the unincorporated area of the township or any portion of the same."

Plaintiffs assert the following to be a definition of the statutory requirement of a comprehensive plan:

"Planners have developed methods and practices for guiding the commissions which they assist. Certain studies are considered essential; knowledge of mineral and other resources, sources of population, its probable increase or decline, educational facilities available and to become necessary, the economic base of the community, the present uses of the land, transportation facilities presently available and probable future requirements, utility services presently available and probable future requirements, are a few, by way of example, of the topics considered basic to the promulgation of a 'comprehensive plan' for the community. When the planning commission has had the opportunity to consider all of the information which can be assembled, it is then in a position to determine upon a 'comprehensive plan.'

"A 'comprehensive plan,' therefore, is the sum total of the considered opinion of the planning commission or board as to the future development of the entire community from the standpoint of general welfare, health, safety and morals. This opinion is based upon a studied consideration of all factors of community life and recorded in the form of text and maps. Charts and photographic reproductions serve as part of the text for the purpose of clarity." (Plaintiffs' trial brief, Page 27.)

A reference to Webster's New International Dictionary, Second Edition, defines "comprehensive" to mean: "Including much, comprising many things, having a wide scope." These meanings were approved in Fairlawn Cemetery Association v. Zoning Commission, 86 A (2d) 74, 77, 138 Conn. 434.

It is said that the limitation that zoning regulations must be made in accordance with a "comprehensive plan" means a general plan to control and direct the use and development of property in a municipality, or a large part of it, by dividing it into districts according to the present and potential use of the property. Bartrum v. Zoning Commission, 68 A (2d) 308, 136 Conn. 89; Couch v. Zoning Commission, 106 A (2d) 173, 141 Conn. 349. In **City of Yougstown v. Kahn, 112 Oh St 654, 148 N. E. 842,** the Court stated: "In other words, this is not a comprehensive zon-

ing ordinance, but is a so-called block ordinance, relating only to a certain small district of the City of Youngstown."

The Canfield ordinance is not a block ordinance in any sense of the word, but is a complete ordinance covering the entire township. The evidence shows that the members of the zoning commission first made a use map of all the lands in the township adjoining public highways by driving along the highways and noting the uses of the various properties and buildings thereon. Assistance was obtained from the County Planning Engineer and it appears that a form of ordinance was submitted by him to the township zoning commission as well as to the zoning commissions of some of the other townships. The township zoning commission held many meetings and discussed many phases and details of the contents of the proposed ordinance; regulations as to strip mining were discussed and drafted into the section of the ordinance dealing with industrial lands. Open hearings were had at which many people appeared and raised questions for the consideration of the zoning commission.

It is the further contention of the plaintiffs that the zoning act must necessarily require an economic consideration of the entire community inasmuch as the economic life of each unit of the community is said to be dependent upon the economic well-being of the whole community. Hewlett v. Town of Hempstead, 133 N. Y. (2d) 690 (1954) is cited holding that a town board in exercising its legislative power to zone property in the town must consider the overall effect on the area zoned and adjacent areas. Other cases are cited from New York and New Jersey containing either holdings or dicta to the same effect. Expert planning engineers testified similarly and to the effect that a comprehensive plan would require the Canfield zoning commission to take into account the economic and industrial needs of the Mahoning Valley, not only Mahoning County but Trumbull County and perhaps a further distance, asserting that the availability of mineral resources by reason of their location required special consideration in any comprehensive plan.

The answer would seem to be that the word, "comprehensive," is a relative term; what might be comprehensive in an agricultural township in Mahoning County would very likely not be comprehensive in the metropolitan area of Cleveland or Cuyahoga County. That would seem to distinguish the New York and New Jersey cases where town and borough lines are indistinguishable from the physical terrain and where great congestion of population and industry and commerce exists. If we were to hold that the Canfield Township zoning commission in the preparation of a zoning resolution must take into account the coal requirements of the Ohio Edison plant in Niles, might it not also become a question whether they should take into account the coal requirements of the Republic Steel Corporation in Warren? And if they did not in such a situation, would the ordinance be void? Are they mandatorily required to take into account the coal tonnage underneath the township and then make a detailed investigation to see whether the various industries of the Valley **might** either now or at some future time desire to use Canfield coal if some strip mining concern **might** sometime in the

future desire to mine it? The answer would seem to be that the enabling statute permits the township to set up its own zoning ordinance having relation to the health, safety, morals and general welfare of the **township**; it is in form an exercise of local power, home rule within the framework of the enabling act.

The studies and investigations argued for by plaintiffs are, of course, highly desirable depending upon local conditions, as in **Pritz v. Messer et al, 112 Oh St 628, 639 (1925)**. However desirable it may be in New Jersey and New York to make mandatory as a matter of law the definition urged by plaintiffs, that has no place in our state, as a mandatory requirement in all cases. Here it should be a question of fact to be decided by the zoning commission in the light of all the facts and circumstances entering into the problem and using reasonable judgment. As stated in Village of Euclid v. Ambler Realty Co., "If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." Likewise here, note in **State, ex rel Jack v. Russell, 162 Oh St 281 (1954)**, 123 N. E. (2d) 261, the Court at Page 289 uses the words, "reasonably comprehensive."

Having in mind these principles and taking into consideration the evidence disclosed in many pages of the record and many exhibits, which are too detailed to be set forth herein, the conclusion is inevitable that the zoning commission and the trustees acted in accordance with a comprehensive plan within the meaning of the enabling act.

IV. The next claim of the plaintiffs is that the removal of coal by the strip-mining method has no substantial deleterious effect upon the health, safety, morals and general welfare of the community, and, therefore, the ordinance cannot be sustained as a proper exercise of police power, for these are the constitutional prerequisites laid down by the United States Supreme Court in Village of Euclid, et al v. Ambler Realty Company, supra.

The same principle is reiterated in Pritz v. Messer, supra. Squarely in point in support of the plaintiffs' position is Midland Electric Coal Corporation v. County of Knox, 1 Ill. (2d) 200, 115 N. E. (2d) 275 (1953), wherein the Supreme Court of Illinois held a county zoning ordinance, which prohibited strip mining of coal in all districts except the "C" District, approximately 90 per cent of the unincorporated area of the county lying outside of "G" District, to be unconstitutional. In that case the gross value of underlying coal was in excess of $25,000,000, and the value of the land exclusive of such coal was approximately $750,000. In the instant case the coal underlying the McCullough tract has a gross value of approximately $1,000,000, whereas the land itself exclusive of such coal is worth $17,000, according to the testimony.

In both situations the coal could not be practically, economically or safely recovered by any process other than strip mining. In both cases the land in question was immediately adjacent to property upon which strip mining is not only permitted but actively conducted. (There is an active strip mine across the road in Ellsworth Township.)

In the Illinois case the Court stated:

"Zoning that prevents mining has the effect of prohibiting any use at all of mineral property. Authorization to use the surface for farming

purposes provides no use for the mineral properties beneath it. * * * The instant resolution does not regulate the use of that property but denies its use without compensation."

It should be observed, however, that the land structure in Illinois is bottomed on a great amount of limestone, and that they·do not have the acid conditions which exist at times in Ohio in strip mining. The result is that the Illinois land returns quickly to normal upon being leveled, and is good crop land without any question. That fact alone is sufficient to render the Illinois principle not applicable here in Ohio.

Many hundreds of pages of testimony were taken on this branch of the case; highly qualified experts in their various fields of learning, in fact one can state with absolute fairness that these experts were the best in the country, were in court from far and near and testified in detail on their particular aspects of the problem. Many interesting and valuable exhibits were before the Court. Plaintiffs' claims can best be summarized by quoting from their summary on Pages 91 and 92 of their direct brief:

"Briefly reviewed, the uncontradicted evidence above set forth in Section IV of this trial brief has proved that (1) the McCullough farm is a marginal one worth about $17,000, (2) the underlying coal is worth about $1,078,000, (3) such coal and other locally stripped coal is essential to the industries of the Youngstown area, (4) the proposed strip mining will not reduce real estate values, (5) reclaimed lands can be and have been used as building sites, (6) forest crops, sorely needed in this county, can be successfully grown on strip-mined land and on the McCullough tract following stripping, (7) forage and other crops can be successfully grown on strip-mined land and on the McCullough tract following stripping, (8) the Ohio Reclamation Association can and will successfully reclaim the McCullough tract according to plans in the record, (9) the proposed operation will not affect surface water, underground water, or pollute the area water supply, and (10) the proposed mining operation will require no blasting, nor create additional noise, dust, traffic or other safety or health hazards."

All of these claims were analyzed carefully by the defendants; similiarly qualified experts testified on their side of the issues and many valuable exhibits were placed in evidence. Defendants assert that the law is settled in Ohio by the case of Smith v. Juillerat, (1954) supra. An examination of the briefs in that case as well as the opinion of the Court shows that none of the issues in the case at bar was raised there; it was assumed that the removal of coal by the strip-mining method did have a relation to the health, morals, safety and general welfare of the community, and was subject to prohibition under the police power in an area zoned as residential. At any rate the Supreme Court so held on Pages 428 and 429, quoted supra.

The case of Marshall Mining Company v. Village of Salineville, 665, unreported, supra, involved an ordinance regulating the mining of coal within the Village of Salineville, and it prohibited the mining of coal by the strip-mining process within that village. The plaintiff-appellant contended that the ordinance deprived owners of property of lawful and valid use of their property without due process of law, and that it

was in direct conflict with the strip-mining act, known then as §898-203 et seq GC. The Court held that the strip-mining act as hereinbefore stated recognized strip mining as a potential nuisance and regulates it as such; that it does not purport to license it or change the character of the potential nuisance but only to regulate it. It held further that it is obvious that strip mining, a potential nuisance, becomes an actual nuisance when such activity is pursued in a center of population, and that the more thickly populated such center is the more intensive and extensive such nuisance becomes.

It should be obseved further that the determination of the question whether or not the regulations prescribed by an ordinance have a real or substantial relation to the public health, safety, morals or general welfare is committed in the first instance to the judgment and discretion of the legislative body. Courts cannot pass upon the wisdom of the zoning ordinance, and the Court will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question. Village of Euclid v. Ambler Realty Co. supra, Page 388; State, ex rel Jack v. Russell, supra; Zahn v. Board of Public Works, 274 U. S. 325, 47 S. Ct. 594; **City of Dayton v. Kresge**, 114 Oh St 624, 150 N. E. 726; **Allion v. City of Toledo**, 99 Oh St 416; 124 N. E. 237, 240; **11 O. Jur. Para. 307, Page 1089.**

This Court holds that the removal of coal by the strip-mining method is subject to regulation, control and, under some circumstances, prohibition, as a proper exercise of the police power. ·

V. Plaintiffs' last contention is that the ordinance in question prohibiting the removal of this coal in an agricultural district unreasonably and arbitrarily deprives plaintiffs of their property without due process of law in violation of the applicable provisions of the Constitutions.

It should be noted that the strip mining of coal is permitted in industrial districts under certain conditions, the applicable provisions of the ordinance being as follows:

"In 'Industrial' Districts there shall be permitted all buildings, structures and uses permitted in any of the other districts and all other buildings, structures and uses except the following, which are specifically prohibited:

"* * *

"6. Strip mining for mineral, sand, gravel, clay, limestone or sandstone deposits except upon adherence to the following provisions:

"(A) The operator shall file with the Township Clerk a bond on a form to be prescribed and furnished by the Clerk, payable to the Township and conditioned for the faithful performance of all the requirements contained in this section.

"The bond shall be in the amount of Five Hundred ($500.00) Dollars per acre based upon the number of acres of such deposits which the operator estimates will be mined by strip mining during one year thereafter; provided, that no bond shall be for less than Five Thousand ($5,000.00) Dollars. Liability under such bond shall be for the duration of strip mining at each operation, and for a period of five years thereafter. Such bond shall be signed by the operator as principal, and by

a surety company, authorized to transact business in this state, as surety.

"Upon receipt of a completion or yearly report, the Township shall charge the area of land, affected by strip mining against the bond filed by the operator at the rate of Five Hundred ($500.00) Dollars per acre. * * *"

There follow other provisions as to the method of collection upon the bond, the distance of excavations from a public road or highway, the restoration of land excavated to a level of not more than 15½ per cent, the extent of the resulting slope between excavated and unexcavated areas, the reseeding and reforestation at the discretion of the zoning inspector of areas strip-mined, the distance of an excavation from adjoining property lines, and the removal of buildings, machinery, and appurtenant equipment.

The Coal Strip Mine Land Reclamation Act (§898-223 et seq GC; §1513.01 et seq R. C.) sets forth in detail the manner, method and requirements under which coal may be mined by the strip-mining methods. The Division of Reclamation has direct, complete control over methods of mining and reclamation, with full power by the terms of the statute to make rules and regulations governing all these matters. It follows that the provisions of the ordinance above quoted, beginning with 6(A), are invalid as invading a field which the legislature has covered in the Reclamation Act. Defendants' counsel states on Page 11 of his brief: "We concede that since the legislature has undertaken to regulate reclamation that township authorities have no right to do so." Construing the above quoted provision dealing with the permissive uses in Industrial Districts, it is therefore obvious that the words, "which are specifically prohibited," absolutely prohibit strip-mining in Industrial Districts, for the reason that the exceptions under Section 6 fall as a matter of law.

So that we have here an ordinance which prohibits the strip-mining of coal anywhere in the township. Of course, the plaintiffs cannot complain of anything regulating industrial districts, but this analysis is made to indicate the effect and scope of the ordinance on an overall basis.

The enabling statute permits the township to "regulate" uses. The word, regulate, does not ordinarily include "prohibit," (although it may, as in Smith v. Juillerat, supra) and express authority to regulate as a general rule negatives by implication the power to prohibit. Ex Parte Kelso, 147 Cal. 609, 82 P. 241; Freeker v. City of Dayton, 88 Oh Ap 52, 85 N. E. (2d) 419, affirmed 153 Oh St 14, 90 N. E. (2d) 851 (1950); State ex rel. Euverard v. Miller, 98 Oh Ap 283, 129 N. E. (2d) 209, Ohio Bar, Oct. 3, 1955. The State of Ohio has recognized strip-mining as a legitimate business by the very enactment of the various statutes dealing with it, and no township may arbitrarily prohibit the conduct of that business. Village of Terrace Park, et al, v. Errett, 12 Fed. (2d) 240 (1926) (6th Circuit).

But from here on we must consider the protective effect of the constitutional guarantees upon the owner of the land in question; whether the power exists to forbid the use must not be considered abstractly, but in connection with all the circumstances and locality of the land

itself and its surroundings.   Village of Euclid v. Ambler Realty Co., supra, Page 387.   Hence viewed in that light, is the impact of the ordinance on plaintiffs' land reasonable or arbirtary?   Is it regulation or is it confiscation of the coal without due process of law?

From the cases cited above it appears that the factor of the temporary use of the land for mining purposes as compared to a total destruction is to be taken into account, as well as the degree in which the values of the property are diminished by the regulation in question.   It appears from Plaintiffs' Exhibit No. 72, being an economic report on Mahoning County and the State of Ohio, that there are 13,375 acres of farmland in the township, of which 35 to 40 per cent is crop land.   The total valuation in 1952 of farmland (roads deducted) was $712,810; exclusive of farms, the land value in the township was $1,004,550 (Record 1358).   In 1950 agricultural income in the State of Ohio was $908,241,600, Mahoning County only contributing $8,703,800.   In 1951 Mahoning County was 8th of 88 in population, 8th of 88 in tax duplicate valuation, but 58th in agricultural income.   The bulk of agricutural income in Mahoning County comes from dairy products and poultry (Record 1362).   A computation from the zoning map in evidence (Plaintiffs' Exhibit 3) shows the relations of the various districts under the zoning ordinance in acres; all of this, of course, is exclusive of the Village of Canfield: agriculture, 11,921 acres, 70 per cent; industrial, 576.6 acres, 3.4 per cent; residential 1 and 2, 4,425 acres, 26 per cent; and business, 84 acres, .6 per cent.   In Terrace Park, et al v. Errett, supra, the evidence showed that the gravel had a value of approximately $50,000.00 which would be entirely lost as a result of the prohibition and that the land for permitted uses had a value of less than one-tenth as much.   In the case at bar the value of the tract, exclusive of coal, was shown not to exceed $17,000; or 1.7 per cent of the value of the value of the coal, which the evidence shows exceeds $1,000,000.00.

The evidence shows that this land is run-down farmland, located on the edge of the township approximately two miles from built-up areas, about 300 yards away from a presently operating strip mine in the adjoining Township of Ellsworth, which mine is taking coal from the same vein.

An opinion worthy of study bearing upon this problem is The Cleveland Builders Supply Co. v. The City of Garfield Heights, Common Pleas Court of Cuyahoga County, No. 644,841, Culbertson, Judge, sitting by assignment, decided March 17, 1955, now pending in the Cuyahoga County Court of Appeals, on appeal on law and fact by the defendant city.

Under all the evidence in the case and under the law as indicated it is the ruling of the Court that this ordinance to the extent to which it applies to the property of the plaintiffs is unreasonable and arbitrary in that it deprives plaintiffs of their property without due process of law in violation of Article XIV of the Amendments to the Constitution of the United States and **Article I, Sections 1, 16** and 19 of the **Constitution of Ohio**.   It should be noted that in Midland Electric Coal Corporation v. Knox County, supra, the Supreme Court of Illinois concluded with this language:

"* * * By this conclusion we do not mean to imply that all zoning regulations prohibiting the strip mining of minerals are necessarily invalid. To the extent to which the decree of the trial court may be construed to apply to property in a different situation and involving different physical facts, it is inappropriate and the decree is modified to apply only to the property in question."

The Court finds against plaintiffs on Issues 1, 2, 3 and 4 but rules for the plaintiffs on 5 to the extent indicated above. This holding and decree as to Issue 5 as indicated is limited to and applies only to plaintiffs' property involved in this case.

Counsel may prepare and submit a decree accordingly.