Peck, J.
It is the contention of the respondents that the relators have no right to maintain an action for a writ of mandamus but “could and should” have brought an action for a declaratory judgment to obtain a determination of the validity of the zoning of their property. Without here passing upon the propriety of the suggested declaratory judgment action, we find that the jurisdictional prerequisites to a mandamus suit exist.
The light to maintain such an action as the instant one has been determined in a long line of cases in which this court has consistently held that a writ of mandamus may be allowed to *378 compel the granting of building permits denied by local authorities on zoning grounds. Those cases include State, ex rel. Wiegel et al., Trustees, v. Randall, Dir., 160 Ohio St., 327, 116 N. E. (2d), 300; State, ex rel. Fairmount Center Co., v. Arnold, Dir., 138 Ohio St., 259, 34 N. E. (2d), 777, 136 A. L. R., 840; State, ex rel. Synod of Ohio of United Lutheran Church, v. Joseph et al., Comm. of Village, 139 Ohio St., 229, 39 N. E. (2d), 515, 138 A. L. R., 1274; Hauser, Commr. of Buildings, v. State, ex rel. Erdman, 113 Ohio St., 662, 150 N. E., 42; State, ex rel. Associated Land & Investment Corp., v. City of Lyndhurst, 168 Ohio St., 289, 154 N. E. (2d), 435; State, ex rel. Ice & Fuel Co., v. Kreuzweiser, Inspr. of Buildings, 120 Ohio St., 352, 166 N. E., 228; and State, ex rel. Gaede, v. Guion, Commr. of Buildings, 117 Ohio St., 327, 158 N. E., 748. Thus the right to maintain a mandamus action to compel the issuance of a building permit in a proper case is well established.
There remains, however, a consideration as to whether there has been such an exhausting of administrative remedies in the present situation as to make a writ of mandamus available as an avenue of relief. In this connection, it is argued vigorously by the respondents that, since no detailed plans and specifications have ever been presented to the respondents, there was never an application formally filed which could have been favorably acted on by respondents. On that point the Court of Appeals found the record to be “abundantly clear” that to have made such a formal filing of complete plans and specifications would have been “to perform a useless act,” and it is also obvious from the record that the preparation of such plans and specifications would have been an onerous and expensive undertaking. (The city Building Inspector testified that the cost of such preparation would have been about $14,000.) It is further noted from the record that the refusal of the respondents to grant the permit in question was never bottomed upon the absence of such plans and specifications from their files. Where the doing of an act which is a prerequisite to the performance of an assigned function of a municipal authority would be onerous and expensive, where it is clear that the doing of such act would be a vain thing, and where the failure to do such act is not the ground for refusal by the municipal author *379 ity to perform its assigned function, failure to do that act will not, as a matter of law, constitute a bar to an action in mandamus to compel the performance of such function.
Passing from the jurisdictional objections which the respondents have raised to the maintenance of a mandamus action, and before entering upon a consideration of the relators’ affirmative contentions, we feel it advisable to briefly review the historical background of the law of zoning. We do this because of the nature of the reasoning most heavily relied upon by the respondents in declining to grant the permits sought.
At the outset it must be recognized that zoning even in its least innocuous and most unrestricting form constitutes a limitation on the ownership of property. The time arrived generations ago[1] when it was recognized, for example, that one could not construct and maintain a stockyard and abattoir on his property in an otherwise exclusive residential area, and when that day of recognition arrived the right of ownership of land without limitation passed (if, in fact, it ever existed). Once the validity and propriety of ruling out the more obnoxious of real estate uses were established, the next problem became obvious: What was to prevent absolute dictation of land use by governmental authority? In the United States, the answer was: The Constitution. Somewhere far short of absolute dictation of land use by the sovereign, the point is reached where control amounts to the taking of property without due process of law and without compensation.
This problem is considered in Constitutional Law in Community Planning, 20 Law and Contemporary Problems, 199, where it is observed:
“In view of the importance of the interests at stake in determining the kind of communities in which people reside, work, *380 rear their children and seek fulfillment of the whole range of human aspirations, it is appropriate to consider whether, and in what respects, the courts have failed to protect deserving interests with constitutional safeguards and, on the other hand, have erected unnecessary or unwise constitutional obstacles to effective action.
“Governmental regulation of economic activity and programs for economic and social betterment no longer are likely to face serious objections grounded in the United States Constitution. * * * However, it would be a mistake to assume that there are no important problems of constitutional law today in local planning activities. A dominant characteristic of such activities is the alteration of traditional concepts of real property ownership. There may be some basis for a belief that the range of the police power of the states is narrower when property is regulated than when freedom of enterprise is controlled. At some ^indefinable point, regulation of property shades into taking of property, which must be compensated, though it must be conceded that the instances in which the court [United States Supreme Court] has determined that this point was exceeded are rare, and that there have been some examples of extreme legislative encroachments upon property which have gone uncompensated.” (Emphasis added.)
In the case of Chicago Title & Trust Co. v. Village of Franklin Park, 4 Ill. (2d), 304, 122 N. E. (2d), 804, the plaintiff was the owner of a tract of land which was rezoned from' industrial to residential use. In passing upon the plaintiff’s complaint based on such rezoning, the court said:
“We are not unmindful that the zoning regulations are sheltered with the presumption of validity and that zoning for residential purposes is always impressed with the wholesome objective of protecting the civic and social values of the American home. Here, however, there is no proof that the residential properties adjacent to the instant tract of land will suffer if one more industrial operation is added to the great number that already abounds in that area. On the contrary, if only residential use was enforced, the damage to the plaintiff is appreciable and the effect is confiscatory.
“ * * * We here * '* * reach the same conclusion that the *381 trial court was correct in its determination that the property in question is wholly unsuited for residential purposes, that to solely restrict its use has the effect of destroying substantial values, that such an ordinance bears no relation to public health, safety, morals or general welfare and is therefore unconstitutional, illegal and void.” (Emphasis added.)
The point was strongly made by the Supreme Court of Pennsylvania in Best v. Zoning Board of Adjustment, 393 Pa., 106, 141 A. (2d), 606, wherein the court said:
“Zoning is the legislative division of a community into areas in each of which only certain designated uses of land ape permitted so that the community may develop in an orderly manner in accordance with a comprehensive plan. The authority of the legislature to permit the zoning of land is derived, as is all legislative authority, from the governmental power of the commonwealth — the ‘police powder.’ This power is plenary except as limited by the state or federal Constitution.” (Emphasis supplied.)
In a somewhat earlier case than those hereinabove cited the Supreme Court of Illinois considered a situation where, like here, the property owner sought to construct what apparently may be described as a 1925-version supermarket. In that case (City of Aurora v. Burns, 319 Ill., 84, 149 N. E., 784), the court observed:
“Zoning necessarily involves a consideration of the community as a whole and a comprehensive view of its needs. An arbitrary creation of districts, without regard to existing conditions or future growth and development, is not a proper exercise of the police power and is not sustainable. No general zoning plan, however, can be inaugurated without incurring complaints of hardship in particular instances. But the individual whose use of his property may be restricted is not the only person to be considered. The great majority, whose enjoyment of their property rights requires the imposition of restrictions upon the uses to which private property may be put, must also be taken into consideration. The exclusion of places of business from residential districts is not a declaration that such places are nuisances or that they are to be suppressed as such, but it is a part of fhe general plan by which the city’s territory is allot *382 ted to different uses in order to prevent, or at least to reduce, the congestion, disorder and dangers which often inhere.in unregulated municipal development.
< < # * *
“* * *' The question is not whether we approve the ordinance under review, but whether we can pronounce it an unreasonable exercise of power, having no rational relation to the public health, morals, safety or general welfare. ’ ’
Interesting similar holdings may be found in the following cases: Barney & Carey Co. v. Town of Milton, 324 Mass., 440, 87 N. E. (2d), 9; Midland Electric Coal Corp. v. County of Knox, 1 Ill. (2d), 200, 115 N. E. (2d), 275; Long v. City of Highland Park, 329 Mich., 146, 45 N. W. (2d), 10; Hitchman v. Township of Oakland, 329 Mich., 331, 45 N. W. (2d), 306; Forde v. City of Miami Beach, 146 Fla., 676, 1 So. (2d), 642; Arverne Bay Construction Co. v. Thatcher, Commr. of Buildings, 278 N. Y., 222, 15 N. E. (2d), 587, 117 A. L. R., 1110; and Thornton v. Village of Ridgewood, 17 N. J., 499, 111 A. (2d), 899.
The last of the cases from other jurisdictions which we cite in the present connection, Krom v. City of Elmhurst, 8 Ill. (2d), 104, 133 N. E. (2d), 1, is of particular interest because of the similarity of the facts there with those presented here. There the action was brought by the owner and the vendee under a contract to purchase the subject property with the intention of erecting a shopping center and accompanying parking facilities. There, as here, the property was bounded by lands zoned on one side as commercial and on the other as residential. After a review of the facts the court commented:
“ * * * it is quite evident that the portion of appellees’ property which abuts on Butterfield and York has little desirability for residential purposes. * * * Zoning ordinances restricting a certain area to residential use have long been held void as to property located in such area but so situated, in its relation to a commercial zone, as to render it peculiarly unattractive and of little value for residential purposes, if at all salable therefor. * % *
“In determining whether the invasion of property rights under a purported police power is unreasonable and confiscatory, the degree in which the values incident to affected proper *383 ties are diminished by provisions of the zoning ordinance must also be considered. ® * *
É Í # # #
“ * * # Considering the evidence in its entirety, we think it manifest that the benefit, if any, which the public receives from the existing ordinance is slight when compared to the extreme hardship imposed upon the appellees.”
Turning to the Ohio cases, we find that this court has repeatedly made similar pronouncements. In Pritz v. Messer, 112 Ohio St., 628, 637, 149 N. E., 30, after a review of the zoning ordinance there involved and a determination of the power of the city to enact zoning provisions, Judge Allen said:
“Even if the municipality has power to zone, however, it must exercise that power so as not to violate the state and federal Constitutions. The specific question confronting us, therefore, is whether the ordinance does contravene the constitutional provisions above quoted. In other words, does the ordinance come within the police power?
“Under the police power society may restrict the use of property without making compensation therefor, if the restriction be reasonably necessary for the preservation of the public health, morals, or safety. This is so, because all property within the state is held subject to the implied condition that it will be so used as not to injure the equal right of others to the use and benefit of their own property.” (Emphasis supplied.)
Continuing this train of thought, Judge Allen in City of Youngstown v. Kahn Bros. Building Co., 112 Ohio St., 654, 661, 148 N. E., 842, 43 A. L. R., 662, after distinguishing the Pritz case, went on to say:
“The police power, however, is based upon public necessity. There must be an essential public need for the exercise of the power in order to justify its use. This is the reason why mere aesthetic considerations cannot justify the use of the police power. * * * It is commendable and desirable, but not essential to the public need, that our aesthetic desires be gratified. Moreover, authorities in general agree as to the essentials of a public health program, while the public view as to what is necessary for aesthetic progress greatly varies. Certain legis *384 latures might consider that it was more important to cultivate a taste for jazz than Beethoven, for posters than for Rembrandt, and for limericks than for Keats. Successive city councils might never agree as to what the public needs from an aesthetic standpoint, and this fact makes the aesthetic standard impractical as a standard for use restriction upon property.”
The court held that the restriction there sought to be imposed had no relation to the public health, safety, morals and welfare and fell outside the inherent police power of the municipality; that the operation of the ordinance constituted a taking of property without due process of law; and that, therefore, the ordinance was invalid as unconstitutional.
We feel that further detailed review of the Ohio cases is not essential, but attention is called to the following eases which have particular application to the present consideration: City of Akron v. Chapman, 160 Ohio St., 382, 116 N. E. (2d), 697, 42 A. L. R. (2d), 1140; Smith v. Juillerat, 161 Ohio St., 424, 428, 119 N. E. (2d), 611; State, ex rel. Jack, v. Russell, Bldg. Commr., 162 Ohio St., 281, 286, 123 N. E. (2d), 261; and Curtiss v. City of Cleveland, 166 Ohio St., 509, 144 N. E. (2d), 177. In each of those cases, as in those of other jurisdictions hereinabove cited, zoning restrictions which required one to use his land in accordance with the needs and nature of the community were held to be proper, but restrictions were held to be violative of the Constitution where they exceeded the proper exercise of the police power.
In conformity with the foregoing, we fully recognize the fact that constantly expanding concepts of zoning philosophies dictate that restrictions are no longer imposed simply to please the aesthetic tastes and protect the economic investment of the next-door neighbor, and that wise zoning must be based upon wider interests than those of adjacent property owners. Lip service has generally been given to the proposition that spot-zoning, the irreducible minimum of the limited approach, has long since been outlawed, and certainly the greatest good for the greatest number can come from zoning plans encompassing large geographical areas. In such widespread long-range planning there must be a progression of thought *385 far beyond a consideration of the immediate use of a given parcel of land, and there must also, of necessity, be an overlapping into other areas of study. In fact, it is paramount in such planning that all the needs of the community, including its recreational, educational and economic requirements, be studied. However, restrictions imposed must stop short of imposition as a means of establishing economic fiat as opposed to a mere limitation of land use.
In the present case, respondents complain that the needs of the community in the field of retail purchases are already well served, and that, therefore, there is no need for such a supermarket as the relators propose to create. If a curtailment in this area by governmental action rather than by the law of supply and demand is to be made, it must be made through some other governmental agencies than zoning authorities. The Court of Appeals dealt summarily with this contention, and, like it, we feel that it “need not be dignified by further discussion.”
A further contention of the respondents falls into the same general category as the argument concerning limitation of competition but is rather more disturbing in its nature and implications. It deals with the respondents’ alarming prognostications as to the increase of traffic hazards and nuisances which would accompany the use of the Walworth Tract for supermarket purposes. It is difficult indeed today to contemplate the use of land for any purpose, whether it be for the most modest of individual dwellings or for the most extravagent of housing, mercantile or industrial expansions, without taking into account the traffic factors. In the case of the more modest construction, only the need for ingress and egress and parking facilities need be considered, but even there the desirability of off-street parking is a factor. In the case of the larger contemplated establishments, the ingress and egress and parking problems remain (however many times multiplied), and a proper further subject for consideration is the road pattern of the area generally and its capacity to sustain the burden of increased traffic flow. For example, street capacities can be a vital factor in determining whether a six- or sixty-story building should be permitted on á given site.
*386 From the point of view of the party who considers making an improvement, this study may be important only to the extent that it bears on his own conveniences and economic calculations. However, from the point of view of zoning authorities making a similar study, the needs of the community as a whole must, as always, be paramount, and this court recognized the importance of traffic considerations in the recent case of State, ex rel., v. Lyndhurst, supra. Nonetheless, traffic regulation must remain a byproduct of zoning activities, and the primary product must always be to insure the greatest enjoyment of one’s land, taking into account the rights of others and the needs of the community. Thus, if the present proposal is otherwise lawful and proper, the public authorities must find some manner of dealing with the traffic hazards of Euclid Avenue other than by curtailing the use of the Walworth Tract by the relators.
The prayer of the relators for relief is grounded upon two distinct contentions. The first is that the zoning authorities are guilty of an abuse of discretion in not issuing, under the discretionary powers existing in the present zoning ordinance, the building permit sought, and the second is that the refusal to amend the zoning ordinance to reclassify the area in question- from U-2 to U-3 constitutes a taking of such property without due process, resulting in its confiscation.
The first of these contentions is based on the zoning ordinance of East Cleveland (Section 38.400) which provides that the Board of Zoning Appeals shall have a discretionary power in hardship cases to grant what is referred to as a “variance.” This power to grant a variance is created as a discretionary device, and the relators argue that it was designated for use in exactly such a situation as exists here, and that the respondents ’ refusal to so use it constitutes an abuse of discretion.
In the present case, the portion of the Walworth Tract zoned U-2 may be described as a landlocked island cut off entirely from public rights of way by properties either otherwise zoned or otherwise owned. In other words, this isolated area of some three acres can be reached only from a public street by passing either over land zoned as U-3 or U-4 or over *387 land owned by other parties. The record is replete with testimony tending to show that all possible efforts have been made over a period of many years to find a suitable use for this property.[2]
None of the plans looking to a profitable use of the area came to culmination because of the impediments existing in the zoning restriction, although the granting of a variance would have permitted the economic productivity of this presently unusable land. We find it an abuse of discretion on the part of the respondents to refuse to grant a variance authorized in hardship cases by city ordinance where it has been shown that a proposed use of the land is in harmony with the needs and nature of the community and where no economically feasible use of the land may be made without such a variance.
The record discloses further that the entire area here under consideration, including not only the Walworth Tract but the neighboring properties, was made the subject of the present zoning regulations in 1922. At that time the entire vicinity consisted of unimproved properties, and only two of the established streets in this area connecting with Euclid Avenue were in existence. Subsequently other streets were created, including one just to the east of the Walworth Tract and on which front the apartment buildings which back up to the Walworth Tract’s east line.
It is the relators’ contention that it was the creation of this street and the subsequent construction of these apartment buildings that completed the isolation of the U-2 portion of the Walworth Tract, already lacking in access from the other three sides. Without conceding the persuasiveness of the argument, the fact is noted that no change in zoning affecting the Walworth Tract was made since the time of the creation of the “new” street.
*388 Without considering the reason for its isolation, it is our conclusion in this connection that, where an isolated parcel of land is similarly zoned as are parcels with which it is contiguous on one side but it extends into and is surrounded on the three other sides by an area of land zoned for less restricted uses, where no feasible economic use of the former land can be made under the present zoning, and where a reduction to the next less restricted use is in harmony -with the needs and nature of the neighborhood, the refusal to extend the less restricted use to such property constitutes a taking of it without due process, resulting in its confiscation.
It is the conclusion of this court that, mandamus being available to the relators, the Court of Appeals was justified in finding that there was an abuse of discretion on the part of the respondents and in issuing the writ prayed for by the relators.
It follows that the judgment of the Court of Appeals, should be, and it is, hereby, affirmed.

Judgment affirmed.

Weygandt, C. J., Zimmerman, Taft, Matthias, Bell and Herbert, JJ., concur.

Such use restrictions appeared in the American colonies in the last decade of the seventeenth century._ The first reported law applied to Boston. Salem and Charleston and to any other market town in the province and controlled the location of slaughterhouses and distilleries; and the business premises of chandlers, couriers and potters’ kilns were added to the list in 1741. The Romans used use restrictions to limit certain building constructions, and zoning provisions were applied in the city of Frankfurt, Germany, in 1884. 8 McQuillan Municipal Corporations (3 Ed., Rev.), 15, Section 25.03.

We are not unmindful of the arguments made by the respondents in this connection and of the proposals which they made, apparently for the first time, in this court. These proposals, presented as “Plan No. 1” and “Plan No. 2,” are diagramatically portrayed in exhibits set forth in their brief. However, nothing in the record bears upon the feasibility of these proposals, and we do not feel free to either adopt the respondents’ conclusions in this regard or to supply our own.